**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Civil Action No. 14-cv-2337-CMA

DONNA KAYE FREIDENBERGER,

      Plaintiff,

v.

CAROLYN W. COLVIN, Commissioner of Social Security,

      Defendant.

---

**ORDER REVERSING AND REMANDING ALJ'S DECISION**
**DENYING SOCIAL SECURITY BENEFITS**

---

      This matter is before the Court on review of the Commissioner's decision to deny the application of Plaintiff Donna Kaye Freidenberger ("Plaintiff") for social security disability benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-33.  Jurisdiction is proper under 42 U.S.C. § 405(g).

## I. BACKGROUND

      Plaintiff filed an application for disability benefits, alleging a disability onset date of June 4, 2011.  (AR at 27.) [1]  Plaintiff was born on May 21, 1963, and was 48 years old on the date of her alleged disability onset.  (AR at 97-98.)  After her initial application was denied, Plaintiff requested a hearing, which was held on November 29, 2012, before an Administrative Law Judge ("ALJ").  (AR at 39-96.)

---

[1] Citations to the Social Security Administrative Record, which is found at Doc. # 10, will be to "AR" followed by the relevant page number.

Plaintiff applied for disability benefits on July 14, 2011, after sustaining serious injuries on June 4, 2011, when she was struck by a car as a pedestrian. (AR at 215, 219.) In that accident, she suffered fractures of her left wrist and her left leg. (AR at 45.) She underwent surgery for both of these injuries at Denver Health Medical center in approximately August of 2011. (AR at 45-46.)

On September 1, 2011, Plaintiff saw a resident at Denver Health Medical Center ("Denver Health"). (AR at 825.) The resident took x-rays and performed a physical examination of Plaintiff, and noted Plaintiff was "three months out from her index procedure, doing well. She has been working with therapy. Has minimal pain or any other sort of complaints at this time and says she is achieving good range of motion with her wrist." (AR at 825.) Plaintiff also complained of "some mild pain across her left hip." (*Id.*) Plaintiff was to "continue with her therapist" and that she would start some "light weightbearing as tolerated." (*Id.*) That same day, Plaintiff also saw Meryl Singer, M.D., also at Denver Health, to whom she reported that she was experiencing "minimal" pain in her left wrist and that her range of motion was "returning well." (AR at 824.) Dr. Singer noted that she agreed with the resident's evaluation, examination, and treatment recommendations. (*Id.*)

On September 16, 2011, Plaintiff had a follow-up examination after her leg surgery. (AR at 829.) She reported to the attending physician that "her pain is fairly well-controlled on oral pain medicine and that her pain in her tibia is getting better." (*Id.*) Her x-rays revealed "a healing distal tibia fracture as well as a healing of her fibular

shaft fracture as well as healing of her fibular shaft fracture with no evidence of

hardware complications." (*Id.*)

On September 28, 2011, Plaintiff saw Richard B. Madsen, Ph.D, for a

psychological evaluation related to her Colorado Medicaid application.  (AR at 427.)  Dr.

Madsen noted that Plaintiff had experienced severe trauma: she was molested by her

stepfather as a child, and encountered her roommate's dead body after he committed

suicide.  (AR at 428.)  "She has nightmares and flashbacks, intrusive thoughts . . .

hypervigilant response.  Distances people emotionally.  Has a history of abusive

relationships as an adult." (*Id.*)  Plaintiff also reported to Dr. Madsen that she felt

depressed and has "panic attacks on a daily basis." (*Id.*)  Dr. Madsen diagnosed her

with bipolar disorder, chronic PTSD, and panic disorder with agoraphobia, and

specifically noted that her symptoms "interfere with her ability to work."  (AR at 430,

431.)

Plaintiff had seen general practitioner Carolyn Sze-yun Chen, M.D. since 2006,

and continued to see her after her accident.  (AR at 511.)  In September of 2011, Dr.

Chen noted that Plaintiff reported she was "sexually, physically, and emotionally abused

as a child.  Now feels ok except crying because roommate hung himself to death last

December & she still has flashbacks & can't sleep well at night.  Requests more Xanax

because this helps her to sleep."  (AR at 480.)   Dr. Chen noted that Plaintiff had been

diagnosed with "depression, major, in partial remission," and "Bipolar 1."  (AR at 640.)

In October of 2012, Dr. Chen saw Plaintiff for "back pain": "has sciatica bilaterally & is in

the front & in the back of her pelvis & legs all the way down." (AR at 624.)  Dr. Chen

also noted that Plaintiff was "taking prozac 10 mg at night & having insomnia problems. Also wonders if she could be having fibromyalgia & if this would help her disability claim."  (AR at 624, 625.)

In December of 2012, Dr. Chen reviewed x-rays of Plaintiff's tibia and fibula, which showed that her fractures had healed.  (AR at 832.)  An MRI of Plaintiff's lower back, taken the same day, showed "mild-to-moderate degenerative disc disease and spondylosis [spinal arthritis] in the lower half the lumbar spine."  (AR at 833-34.)

At her hearing, Plaintiff testified that after her surgeries, between November 2011 and April 2012, she used a wheelchair, a walker, crutches, and finally graduated to a cane.  (AR at 46-47.)  She continues to use a cane on a daily basis.  (AR at 47.)  She further stated that she did not believe she had fully recovered from the accident or her surgeries because she experienced pain in both legs, attributing this pain to spinal stenosis, and that she also experienced pain on the right side of her rib cage and in her left arm.  (AR at 52, 54-55.)  She described this pain as "constant" and "moderate" on a daily basis, but "severe" at night.  (AR at 52-53.)  She described her right arm as being "much stronger" than her left arm after her accident, and noted that she could not bear weight on her left arm without significant pain in her wrist.  (AR at 70.)  She further testified that she could not walk normally due to poor balance, that she could stand for no longer than five minutes without experiencing pain, and that she laid down for six to eight hours a day.  (AR at 35, 68, 76, 78.)  She stated that she used an electrical cart while grocery shopping, and that she could lift and carry about two to three pounds. (AR at 69.)

As for her mental health, Plaintiff testified that she was "very depressed" and felt worthless "a lot," and that on most days, she did not dress herself.  (AR at 35, 63, 71, 73-74.)  She noted that she was taking Clonazepam, an anti-anxiety drug, as well as Prozac.  (AR at 63.)  She stated that she had thought about hurting herself since her accident: "A few times I thought about I should just give up because nothing seems – how am I going to ever get my life back you know. Just very depressed, and then seeing the accident, that goes through my head all the time."  (AR at 73.)

Plaintiff had the equivalent of a high school education.  She worked for a cellular phone company in 1996 and 1997, refurbishing and testing cell phones, but the company went bankrupt after about six months.  (AR at 83.)  For a time, Plaintiff was homeless and struggled with alcoholism.  (AR at 654, 695.)  Plaintiff was last employed in 2007, when she was employed as a cashier at a thrift store.  (AR at 72.)  In her initial disability application, she stated that she was laid off from this job; at the hearing, she testified that she was fired because of her inability to correctly count change for customers.  (*Compare* AR at 215-216 to AR at 72.)  She collected unemployment benefits from 2010 through 2011, during which time she applied for jobs but was not hired.  (AR at 48.)

A vocational expert ("VE") testified at the hearing.  The ALJ posed several hypothetical questions to the VE, all assuming an individual with the same age, education, and work experience as Plaintiff.   The second hypothetical assumed an individual with the residual functional capacity ("RFC") ultimately assessed by the ALJ.

The VE testified that such a person could perform work as a repairer of switchgear communications equipment.  (AR at 37, 91-92.)

On December 18, 2012, the ALJ issued a partially favorable decision, concluding that claimant was disabled from June 4, 2011 to June 4, 2012, because she would miss more than two days of work per month due to symptoms, treatment, and rehabilitation from the injuries sustained in the June 2011 car accident; thus, no work existed in the national economy that she could perform.  (AR at 31, 33-34.)  However, for a variety of reasons discussed in greater detail below, he concluded that "there is no medically determinable impairment of a mental health condition."  (AR at 31.)

Because he found that Plaintiff was disabled, the ALJ applied the seven-step sequential evaluation outlined in 20 C.F.R. § 416.994 to determine whether Plaintiff's disability continued.  He concluded that Plaintiff's severe impairments remained the same for the period beginning June 5, 2012, and none of her impairments at that point – alone or in combination – met or equaled a listed impairment.  (AR at 34.)  He found that medical improvement occurred as of June 5, 2012, and the medical improvement was related to Plaintiff's ability to work because Plaintiff's residual functional capacity (RFC) had increased as of that point.  (AR at 34.)  Specifically, the ALJ found that beginning June 5, 2012, Plaintiff could:

- lift and carry 20 pounds occasionally, 10 pounds frequently;

- stand/walk for two out of eight hours a day;

- sit for six out of eight hours a day;

- push and pull or operate hand or foot controls with her left extremities frequently;

- climb ramps and stairs occasionally.

However, she could never climb ladder, scaffolds, or ropes; walk on uneven terrain or

for long distances unless using a hand-held assistive device; or have exposure to

unprotected heights. (*Id.*) The ALJ thus determined that Plaintiff retained the ability to

perform her past work as a repairer of switchgear communications equipment, as

actually performed and as generally performed in the national economy. (AR at 37-38.)

As such, Plaintiff was no longer disabled as of June 5, 2012. (AR at 38.)

Plaintiff requested that the Appeals Council review this portion of the ALJ's

decision, which it declined to do. (AR at 1-4.) On August 22, 2014, Plaintiff filed her

appeal to this Court of the Commissioner's final decision. (Doc. # 1.) Plaintiff filed her

opening brief on January 8, 2015, the Commissioner responded on March 13, 2015,

and Plaintiff replied on March 30, 2015. (Doc. ## 14, 17, 18.)

## II.  STANDARD OF REVIEW

The Court reviews the ALJ's decision to determine whether substantial evidence

in the record as a whole supports the factual findings and whether the correct legal

standards were applied. *See Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009).

Substantial evidence is such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion. It requires more than a scintilla, but less than

a preponderance. *Id.* (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)).

Evidence is not substantial if it is overwhelmed by other evidence in the record. *Grogan*

*v. Barnhart*, 399 F.3d 1257, 1261-62 (10th Cir. 2005). In so reviewing, the Court may

neither reweigh the evidence nor substitute its judgment for that of the agency.  *Salazar*

*v. Barnhart,* 468 F.3d 615, 621 (10th Cir. 2006).

### III. <u>ANALYSIS</u>

Plaintiff raises four arguments in support of her contention that the ALJ's decision

should be reversed.  However, because the Court is persuaded to remand the case due

to the ALJ's failure to apply the proper method in determining the severity of Plaintiff's

mental impairment at "step two," and because this finding is interrelated with his other,

later conclusions regarding whether Plaintiff was disabled, this Order is limited to

addressing Plaintiff's first argument – that the ALJ erred when he concluded that her

depression, anxiety, and PTSD did not constitute "severe" impairments.

The Social Security Regulations set out a five-step sequential process for

determining whether an applicant is "disabled" within the meaning of the Social Security

Act.  *See* 20 C.F.R. § 404.1520.  The five steps relate to the following questions:  (1) Is

the claimant presently working in a substantially gainful activity?  (2) Is the claimant's

impairment severe?  (3) Does the impairment meet or equal one of a list of specific

impairments described in the regulations?  (4) Is the claimant able to perform any work

that he or she has done in the past?  (5) Are there significant numbers of jobs in the

national economy that the claimant can perform?  *Id.*  In this case, the ALJ erred at

steps two and three by failing to follow the procedures proscribed in 20 C.F.R. §

404.1520a for determining whether an individual has a severe mental impairment and, if

so, determining whether that impairment meets or equals any of the listed impairments.

Even though Plaintiff did not allege mental impairments as part of her initial disability application, when a record "contains evidence of a mental impairment that allegedly prevented claimant from working, the Secretary [is] required to follow the procedure for evaluating the potential mental impairment set forth in his regulations and to document the procedure accordingly." *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1048-49 (10th Cir. 1993) (citing *Hill v. Sullivan*, 924 F.2d 972, 975 (10th Cir. 1991), 20 C.F.R. §§ 404.1520a; 416.920a).   Section 421(h) of Title 42 provides that:

> [a]n initial determination . . . that an individual is not under a disability, in any case where there is evidence which indicates the existence of a mental impairment, shall be made only if the Secretary has made every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity assessment.

Specifically, at step two of the disability determination, the ALJ must follow a special procedure when evaluating a mental impairment.   *See* 20 C.F.R. § 404.1520a. This entails recording pertinent information on a standard document – the Psychiatric Review Technique Form ("PRTF").   *Id.* § 404.1520a(e).   When a claimant's severe mental impairment does not meet a listed mental impairment, the PRTF must include an assessment of the residual functional capacity.   *Id.* § 404.1520a(c)(3).   The document must be completed at the "initial, reconsideration, administrative law judge hearing, and Appeals Council levels."   *Id.* § 404.1520a(d).   An ALJ may complete the PRTF with assistance from a medical advisor.   *Id.* § 404.1520a(d)(1)(i).   Although the ALJ need not append the PRTF to the decision, [2] the Commissioner must "document application of

---

[2] Although the regulation no longer requires the PRTF to be appended to the ALJ's decision, its analysis must be incorporated into the ALJ's findings and conclusions.   *See Keyser v. Comm'r*

the technique in the decision." *Id.* § 404.1520a(e). Specifically, "the written decision must incorporate the pertinent findings and conclusions based on the [Psychiatric Review] technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)." *Id.* Further, "[t]here must be competent evidence in the record to support the conclusions recorded on the [Psychiatric Review Technique Form] and the [ALJ] must discuss in his opinion the evidence he considered in reaching the conclusions expressed on the form." *Washington v. Shalala*, 37 F.3d 1437, 1442 (10th Cir. 1994) (quotation omitted).

Because Plaintiff's initial disability application did not allege that she experienced mental impairments, none of the disability determinations made prior to the ALJ's considered whether claimant's mental impairment rendered her disabled.[3] Thus, the ALJ made the initial determination of whether claimant was disabled in light of her alleged mental impairment. However, in doing so, the ALJ complied with neither the Social Security Regulations, nor with the statutory requirement to make "every reasonable effort" to ensure that a qualified psychologist or psychiatrist completes the residual functional capacity assessment. In particular, his written decision does not incorporate the PRTF's mode of analysis into his findings and conclusions and does not include a specific finding as to the degree of limitation in any of the four functional areas

*Soc. Sec. Admin.*, 648 F.3d 721, 726 (9th Cir. 2011) (describing history of the regulation and current requirements).

[3] When the issue of a mental impairment arises for the first time at the ALJ hearing level, the ALJ may choose to remand the case to the State agency for completion of the document and for a new disability determination. *Id.* §§ 404.1520a(d)(1)(iii) & 416.920a(d)(1)(iii). The ALJ did not do so here.

(i.e., the activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation).  Rather, the ALJ appears to have based his conclusion that there was no medically determinable mental health impairment not on medical evidence, but on an irrelevant combination of (a) Plaintiff's failure to allege a mental impairment as part of her initial application, and (b) his own, lay evaluation of the evidence of her mental impairment.

Although the ALJ acknowledged there was evidence that Plaintiff had been diagnosed with "bipolar in remission" and that Plaintiff was prescribed psychotropic medication, he concluded that her diagnosis and medication were not evidence of a mental impairment because Plaintiff "reported that this [medication] was related to difficulty sleeping."  (AR at 30.)   However, this inference was unwarranted by the record, which indicates that Plaintiff's sleeplessness was, in fact, directly linked to Plaintiff's psychological issues.  Plaintiff told Dr. Chen that she was "sexually, physically, and emotionally abused as a child.  Now feels ok except crying because roommate hung himself to death last December & **she still has flashbacks & can't sleep well at night**.  Requests more Xanax because this helps her to sleep."  (AR at 480) (emphasis added).  Additionally, her medication record indicated that she was taking Prozac for "depression [and] anxiety," not only sleeplessness, that she also took Ambien for sleeplessness (AR at 239), and that Plaintiff was also taking Clonazepam, an anti-anxiety medication  (AR at 63).  Indeed, Dr. Chen specifically noted that Plaintiff was taking Prozac for bipolar disorder and that "some quickened pace to her speech ma[de] [her] concerned for possibility" of manic signs of said disorder.  (AR at 630.)

Moreover, "bipolar in remission" was not the only potential mental impairment at issue before the ALJ; Plaintiff also reported feeling depressed and anxious, and, in addition to bipolar disorder, Dr. Madsen specifically diagnosed her with chronic PTSD, as well as panic disorder with agoraphobia.  (AR at 430.)  Although the ALJ stated that he "considered" the psychological evaluation performed by Dr. Madsen, he essentially dismissed it out of hand because it was a "one-time" report "not supported by the record as a whole which reveals that the claimant was not seeking mental health therapy and did not consistently complain of psychological symptoms."  (AR at 30.)  However, "mental illness in general and bipolar disorder in particular (in part because it may require a complex drug regimen to deal with both the manic and the depressive phases of the disease), may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment."  *Kangail v. Barnhart*, 454 F.3d 627, 630-31 (7th Cir. 2006) (internal citations omitted); *see also Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) ("the ALJ appears to have rejected Dr. Baca's opinion based upon his own speculative lay opinion that claimant failed to comply with prescribed treatment, an improper basis to reject the treating physician's opinion");  *Proctor v. Astrue*, 665 F. Supp. 2d 1243, 1255 (D. Colo. 2009) (that plaintiff did not undergo counseling for her mental impairments or did not otherwise obtain or comply with treatment were "not bases to reject medical evidence about [p]laintiff's condition.")  In any case, Dr. Chen's medical records reveal that Plaintiff did seek medication, if not psychological counseling, for her symptoms on a consistent basis.[4]  Additionally, other than stating it

_____

[4] Plaintiff also testified that she had no income, which would make paying for mental health

was a "one-time" evaluation, the ALJ did not cite any issues with Dr. Madsen's credentials, nor did he explain the basis for rejecting Dr. Madsen's diagnosis with reference to the factors governing the evaluation of medical-source opinions set out in 20 C.F.R. §§ 404.1527(d)–(f), 416.927(d)–(f). *See generally Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) (discussing factors). Rather, the ALJ was substituting his own judgment about the severity of Plaintiff's symptoms – given the fact that she had not sought treatment – for that of Dr. Madsen, a mental health professional. *See Winfrey v. Chater*, 92 F.3d 1017, 1021–22 (10th Cir. 1996) (an ALJ is not entitled to reject a treating doctor's opinions without adequate justification or to substitute his own medical judgment for that of mental health professionals).

Additionally, the ALJ's discussion of Plaintiff's anxiety and depression in particular amounted to a single sentence: "the claimant reported a long history of anxiety and depression but did not indicate that this had precluded her from working in the past and there is no indication that the symptoms had worsened to any extent that they would now preclude work." (AR at 30-31.) Nevertheless, a close examination of the hearing transcript indicates that the ALJ did not ask her how her depression or anxiety affected her ability to work. Additionally, Dr. Madsen specifically noted that her psychological symptoms interfered with her ability to work. (AR at 430, 431). Lastly, the Commissioner's regulations explicitly recognize that the level of functioning for a claimant who suffers from mental impairments "may vary considerably over time." 20 C.F.R. Pt. 404, Subpt. P, app. 1, § 12.00D(2); *Phillips v. Astrue*, 413 F. App'x 878, 886

---

treatment difficult.

(7th Cir. 2010) ("Many mental illnesses are characterized by 'good days and bad days,' rapid fluctuations in mood, or recurrent cycles of waxing and waning symptoms.")

An ALJ's failure to comply with 20 C.F.R. § 404.1520a is not harmless if the claimant has a "colorable claim of mental impairment." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 726 (9th Cir. 2011); *see also Hill*, 924 F.2d at 975. The record here contained colorable evidence of a mental impairment; thus, the "Secretary was required to follow the procedure for evaluating the potential mental impairment set forth in his regulations and to document the procedure accordingly." *Hill*, 924 F.2d at 975. However, the court may not re-weigh the evidence and apply the psychiatric review technique in the first instance. *See Salazar*, 468 F.3d at 62. Therefore, remand is necessary to allow the Commissioner to apply the psychiatric review technique to evaluate Plaintiff's mental impairments. *See Hill*, 924 F.2d at 975 ("The Secretary failed to follow the appropriate procedure, so we must remand the case for proper consideration of claimant's potential mental impairment.")

Additionally, because the ALJ erred in applying the incorrect legal standard to evaluate the severity of Plaintiff's mental impairments at step two, it is possible that a proper determination could result in a change in the determination of Plaintiff's disability. Therefore, it would be premature for the Court to comment further on the determination to be made at step four or step five of the sequential evaluation process. *See Reveteriano v. Astrue,* 490 F. App'x 945, 947 (10th Cir. 2012) (declining to engage in an "advisory discussion" of other challenges to the ALJ's findings because "required re-evaluation of those opinions will necessarily inform—indeed may significantly alter" the

ALJ's decision); *Cf. Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) ("We will

not reach the remaining issues raised by appellant because they may be affected by the

ALJ's treatment of this case on remand.").

## IV.  <u>CONCLUSION</u>

Accordingly, IT IS ORDERED that the ALJ's denial of social security disability

benefits is REVERSED.  This case is REMANDED to the Commissioner, who is

directed to conduct the procedures proscribed in 20 C.F.R. § 404.1520a for determining

whether Plaintiff has a severe mental impairment.  After doing so, the ALJ is also

ORDERED to reassess the disability determination.

DATED:       May 26, 2015

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge